# EXHIBIT 4

May 20, 2020 cease and desist letter
from Kerry S. Culpepper to
Neil D. Greenstein



# CULPEPPER IP, LLLC

ATTORNEY AT LAW

75-170 HUALALAI ROAD, SUITE B204
KAILUA-KONA, HAWAII 96740

TEL: (808) 464-4047
FAX: (202) 204-5181

WWW.CULPEPPERIP.COM

PATENTS, TRADEMARKS & COPYRIGHTS

Via E-mail<copyright@he.net>

KERRY S. CULPEPPER *

* ADMITTED TO PRACTICE IN VIRGINIA, HAWAI'I
  AND BEFORE THE USPTO

May 20, 2020

Via First Class Mail
Neil D. Greenstein
TechMark
1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102

Re:  Cease and Desist of Direct Copyright Infringement, Contributory Copyright Infringement at
Hurricane Electric Subscriber IP addresses
My Reference and Case Number: 19-cv-169-LEK-KJM (District of Hawaii)

Dear Mr. Greenstein,

I am writing in reply to your reply letter of May 15, 2020 (but incorrectly dated June 15,
2020).  As you most likely expect, I disagree with all your legal conclusions and factual
assertions.  HE account holders directly infringed and continue to infringe my clients' exclusive
rights of at least reproductions and distribution.  HE contributes to these infringements by
continuing to provide Internet service to these account holders despite the Infringement Notices
("Notices") sent to HE by my clients' agents.

In the outset, I would like to point out that in your email of April 19, 2020 you stated,
"Please identify the clients you represent and the IP address on which your clients' rights have
allegedly been infringed. We can then address those claims…"  That is exactly what I provided
to you.  However, in your reply letter you stated that my letter "…failed to identify sufficient
facts even to make out a prima facie case of infringement.".   You did not request that I send the
data files, notices, or other evidence of infringements by HE account holders.  I sent to you
exactly what you requested – the IP addresses, client names and their motion pictures.

**The Evidence of Direct Infringement of HE account holders**

My clients' agent Maverick Eye ("MEU") identifies IP addresses on peer-to-peer
networks distributing my clients' motion pictures by monitoring resources that broadcast IP

addresses sharing the motion pictures.  In many cases, MEU can monitor these IP addresses at various stages of downloading and confirm whether the user at the IP address possesses 100% of the infringing file copy.  MEU performs a data exchange with each IP address to confirm actual distribution of the infringing file copy of the motion picture.  The Notices are then sent to ISPs such as HE based upon the evidence of actual distribution.  Thus, the evidence obtained by the MEU will establish a *prima facie* case of a direct infringement and distribution of my clients' exclusive right to distribute and reproduce their motion pictures.  This is the same type of circumstantial evidence of direct infringement that the Western District of Texas found acceptable in *Grande* and the Eastern District of Virginia found acceptable in *Cox I* and *II*.

Finally, each of Notices includes the illicit file names of the motion picture shared by the account holder.  For example, in the two exemplary notices I sent in the first letter the file names are: Hellboy (2019) [BluRay] [1080p] [YTS.LT] (obtained from YTS.LT) and Hellboy.2019.1080p.KORSUB.HDRip.x264.AAC2.0-STUTTERSHIT (obtained from RARBG.TO).  The file names are also circumstantial evidence that they are illegitimate copies made from the same HE IP address and thus a direct infringement of my clients' exclusive right of reproduction in their motion pictures.

You argue that Ninth Circuit decision in *Cobbler Nevada* prevents me from establishing the direct infringements of the account holders unless I point out the specific end user responsible.  I find it amusing that you seek to compare your client HE – described by you as an OSP that provides B2B-type connections to account holders across the United States and competes with Verizon, Comcast and AT&T– to the adult day care center operator Defendant in *Cobbler Nevada* that provided WiFi service to its adult residents.  The differences are so stark that it is hard to take the comparison even seriously.  The adult day care center Defendant in *Cobbler Nevada* did not have accountholders to terminate in response to Notices.  When the Plaintiff ISP Grande Communications Networks, LLC ("Grande") attempted to make this same argument in the Western District of Texas it was completely rejected just in a footnote.  *See UMG Recordings, Inc., et al. v. Grande Communications Networks, LLC,* 1:17-CV-365-DAE, Doc. #268, pg. 40 ("*Grande*").  This argument was also rejected by the Eastern District of Virginia in *Sony Music Entertainment et al v. Cox Communications, Inc. et al*, 1:18-cv-00950-LO-JFA, Doc. #586, pgs. 22-24 ("*Cox II*").

## The Evidence of Contributory Infringement

Without conceding that the Ninth Circuit is the relevant law, in the Ninth Circuit, generally one infringes contributorily by intentionally inducing or encouraging direct infringement.  Some decisions require knowledge.  However, under any standard of contributory infringement HE is liable because HE had *actual* knowledge of direct infringements from the numerous Notices my clients' agent sent to you.  Even when HE ignored many of these Notices,

HE's willful blindness in these circumstances also satisfies the knowledge requirement.  *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011).

HE encourages or materially contributes to the account holders' direct infringements by providing the facilities and means for the account holders' to continue their infringements – namely the Internet service.  Along this line, I found it interesting that you would challenge that HE has directly or contributed to copyright infringements while conceding that HE acts as a "…"highway" and provided subscribers with internet access"… and operates a "data center".  Even if transmissions of infringing material are performed by the end user, HE performs "…the transmission, routing, provision of connections, or storage of the infringing material" by the HE data center and/or routers and servers that makeup his "highway".  These are the activities that an OSP performs to, for example, transport data packets from the account holder to the next destination.  This very concern that these activities would render all OSPs liable for direct and contributory infringement is one of the reasons that the DMCA was passed by Congress.  That is why it is important for an OSP to comply with the provisions of the DMCA such as in 17 USC 512(i)(1)(A) to keep its safe harbor.  However, not only has HE failed to comply with this provision by not taking meaningful actions in response to the Notices from my clients' agents, it is apparent that HE did not even forward many of these notices to their account holders.  Nonetheless, HE had knowledge of its account holders' infringing activity by the notices my clients' agents sent to HE but still continued to provide normal data transmission operations to provide the "highway" so the infringements continued.  Accordingly, HE encouraged and/or materially contributed to the copyright infringements.  HE could have taken the simplest measure to terminate the customer account and stop further infringement – namely terminating the account but the profits from these infringing accounts were simply to delicious for HE to pass up.

Besides HE's liability for contributing to the direct infringements of its account holders, arguably HE is also liable for its own direct infringements of my clients' motion pictures.  Particularly, when HE routed the data packets of the infringing material from its account holders to destinations, HE likely copied and temporarily stored copies of the materials during the normal transmission, routing, and provision of connections.  Ordinarily, HE would probably not be liable because of lack of volitional conduct.  However, because HE had actual knowledge of the infringing activity, yet continued to provide service for the account holders, a Court may decide that HE has sufficient volitional conduct to be liable for direct infringement.

**Vicarious Liability**

I have not made assertions regarding whether HE is liable under vicarious copyright infringement.  However, I note that the District Court of Colorado rejected arguments similar to yours made by the Defendant in *Warner Records Inc. v. Charter Communications, Inc.*, 1:19-cv-

00874-RBJ-MEH, Doc. #157.  Particularly, the District Court determined that the Plaintiffs' allegations that Defendants' failure to stop or take other action in response to notices of infringement is a draw to current and prospective subscribers was sufficient for the "direct financial benefit requirement" and that Charter's ability to terminate those users about whom it is notified was sufficient for the "right and ability to supervise the infringing activity".  Id. at pgs. 10-12.  Your arguments were also rejected in *Cox II*.

## The Recent ISP Cases

It is not surprising that you do not mention any of the recent ISP copyright infringement cases such as *Grande*, *Cox I* and *II* and *Warner Bros. Records, Inc. v. Charter*.  None of these cases support your position.  In the contrary, in *Sony* the Eastern District of Virginia rejected Cox's argument that it was not responsible for the infringements of business customers who had numerous downstream users – the same argument you are attempting to make.  The Central District of California rejected an attempt by Cloudflare to make a similar argument in *ALS Scan, Inc. v. CloudFlare, Inc.* and concluded that CloudFlare could be liable under a material contribution theory because CloudFlare could take the simple measures of terminating the customer account to stop further infringement.

> The simple answer as to whether Cloudflare could have done something simple to stop the infringement is "yes": Cloudflare can, but does not, end its business relationship with websites that it knows (or arguably knows) are serial infringers.

ALS Scan, Inc. v. CloudFlare, Inc., No. CV 16-5051-GW(AFMX), 2017 WL 1520444, (C.D. Cal. Feb. 16, 2017).  HE could do the same here.

## HE has no safe harbor

As argued previously, HE has no safe harbor because it failed to take meaningful actions against its account holders let alone termination in response to the multiple notices.  You stated that "…HE, as an online service provider which does not provide any intermediate or transient storage…would not have any liability…"  Please explain to me how HE performs its data routing services to provide a "highway" to the content provided to its customers/subscribers without temporarily storing, copying, and forwarding the data packets.  It is telling that you spend only one paragraph in your reply letter arguing that HE has a safe harbor.

## Jurisdiction

I never argued that jurisdiction of HE in Hawaii is appropriate.  However, it should be noted that when the HE subscribers sent copies of my clients' motion pictures (in the 19cv169 case) to the Hawaii Defendants, HE purposefully directed electronic activity into this District.  Particularly, since HE acted as a "highway" as you state, HE *knew* the destination of these data packets, namely to IP addresses in Hawaii.  Further, many of my clients' claims for copyright infringement arise from this activity.  Moreover, the HE infringing account holders appear to be

dispersed across the United States – some in the same districts as the Courts in *Grande, Cox I* and *Cox II*. The purposeful direction test will likely support jurisdiction in the forums where the infringement occurred as well.

**Conclusion**

      I sincerely hope that HE reconsiders its position after reviewing the above points and agrees to our three requests (terminate the account; agree to take appropriate action on further notices; pay a portion of the damages). Please consider the vast damage that is being done to my clients by these HE customers. To give a concrete example, in my previous letter I pointed out that the clients' agent had sent multiple notices regarding infringements for the account of IP address 72.52.87.188 ("188"). Nonetheless, since the date of that previous letter MEU has captured nearly 50 more instances of copyright protected content being illegally shared from the 188 address. For example, MEU captures the motion picture *The Rest of Us* of our client Sugar Shack Productions Ontario, Inc. being shared at the 188 address on 2020-04-28 06:06:38 UTC and the motion picture *The Hurricane Heist* of our client Screen Media Ventures, LLC being shared multiple times from 2020-03-26 20:19:10 to 2020-03-27 00:36:54 UTC at the 188 address. None of these infringements would have happened if HE had terminated this account after my previous letter. You may notice that these two clients and motion pictures were not included in the previous list. The problem is that the longer HE fails to terminate the accounts of repeat infringers such as the 188 address that have become piracy cesspools, more of my clients' motion pictures are infringed.

      I respectfully request a reply to my letter by June 15, 2020. This letter is written without prejudice to the rights and remedies of my clients, all of which are expressly reserved.

Sincerely,

/ksc/

Kerry S. Culpepper

kculpepper@culpepperip.com